IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31845-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLAY D. STARBUCK, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Clay Starbuck appeals his convictions for the aggravated first

degree murder of his ex-wife and the violation of her remains, primarily arguing that the

trial court erred in excluding his "other suspects" evidence. We affirm.

FACTS

Clay and Chanin Starbuck were married and divorced twice; they had five

children. When the second marriage ended in July, 2011, the three youngest children—

two girls and one boy—were minors.[1] Ms. Starbuck was awarded custody of the three[2]

children, while Mr. Starbuck was ordered to pay both child support and maintenance to

---

[1] Clay Starbuck was not the father of the youngest boy, a fact confirmed by DNA testing during the investigation.

[2] Another son, 17, lived with Clay Starbuck. The marriage dissolution and parenting plans also addressed his custody and support (a small transfer payment from Chanin to Clay) for the limited remaining period of his minority.

Ms. Starbuck. The decree of dissolution also included a restraining order against Mr. Starbuck in favor of Ms. Starbuck. He was prohibited from disturbing her peace or going on the grounds of her home or workplace.

After the dissolution, the couple maintained separate residences in Deer Park that were about one-half mile apart. Despite the restraining order, Mr. Starbuck appeared at Ms. Starbuck's residence to take the children to school most mornings. By October, Mr. Starbuck was in arrears on his support and maintenance obligations. The superior court entered a judgment on an order of contempt for $9,166 in unpaid obligations plus an additional $500 for attorney fees. The decision to pursue the payment obligations resulted in Mr. Starbuck sending angry text messages to Ms. Starbuck about the financial consequences and also expressing his desire for more time with their children and more say in raising them. Exs. 586-592.

Clay Starbuck texted his children before 8:00 a.m. on Thursday, December 1, 2011 that his car had died and that their mother would have to take them to school. He then sent a similar text message to Ms. Starbuck that was answered with "K." Mr. Starbuck's phone was then turned off. Ms. Starbuck took the children to school.

At 9:18 a.m. Ms. Starbuck's cellular telephone called the Spokane County 911 service. The responder did not hear anything intelligible during the 35 second call. When the call ended, the responder dialed the number back, but the return call immediately went to voicemail; the phone was turned off. Ms. Starbuck did not pick up

2

her children after school. When one of her daughters texted her at 2:45 p.m. asking who was going to pick them up, Ms. Starbuck's phone responded 20 minutes later with a text: "Dad, I have a headache, stay there." Her phone sent a text to Mr. Starbuck 12 minutes later that stated: "I just woke up, can you pick up the kids." Mr. Starbuck's telephone was turned on again at 3:37 p.m. By that time an older child had picked up the younger children and taken them to Mr. Starbuck's home.

Ms. Starbuck did not attend her son's basketball game that evening. There was no response when Mr. Starbuck and the children went to her house after the game. The house was locked and dark. Mr. Starbuck called the Spokane County Sheriff's Office the next day to ask for a welfare check and because the children needed to enter the house to obtain their clothing. Deputies responded that evening and found the lights out, the doors locked, and a package sitting by the front door. Obtaining no response and lacking information to obtain a warrant, they left.

On December 3rd, a friend of Ms. Starbuck's called the sheriff's department and asked them again to check on her. The responding deputies had her landlord unlock the door. They entered and found her dead on her bed. The body was naked,[3] bruised, and battered. Only a mattress pad was on the bed. The blankets were somewhat folded on

---

[3] A nightgown/bathrobe covered her arms, but had been pulled up from behind her back.

3

the floor, but the bed sheets were not in the room. The body was "posed" with a dildo placed in the vagina, her hands were on a massager placed on her pubic area, and her cell phone was on the nightstand next to the bed. A gun safe near the bed was open, displaying sexual devices on the shelves.

The coroner determined that Ms. Starbuck had been strangled with something soft, like a towel, or by a chokehold with an arm. She had chest injuries consistent with the use of a stun gun. The body exhibited multiple bruises—including one on the brain which suggested a blow to the head, eleven broken ribs, and a broken bone in the trachea area. There was indication that her hands may have been bound during the ordeal. The coroner believed the victim died on December 1st. She had been facedown when killed and then moved to the bed.

Clay Starbuck arrived at Chanin's home during the initial investigation. He volunteered to a detective that Chanin was heavily involved with on-line dating and was seeing several men at the same time. He was directed to go to the sheriff's substation in Deer Park. There he repeated his allegations to two other detectives and also provided family history information for them.

Extensive investigation ensued, with much of the emphasis on DNA analysis and cell phones records. Law enforcement obtained DNA (deoxyribonucleic acid) from Mr. Starbuck and his two older sons to establish the "Y-STR DNA" consistent to the male

4

Starbuck lineage.[4] Samples of DNA were also gathered from additional men who recently had contact with Ms. Starbuck. DNA testing of swabs taken from the victim's neck, face, and fingernails revealed that the male Starbuck lineage matched the Y-STR DNA found in those areas. One additional—and unidentified—male contributed Y-STR DNA to Ms. Starbuck's neck. Y-STR DNA was also found in the vaginal swab and on Ms. Starbuck's cell phone, but the male Starbuck lineage (and the other males tested) did not match. A total of three unidentified males contributed DNA found in these locations.

Ms. Starbuck's cell phone records were also extensively reviewed. One person who had exchanged text messages with Ms. Starbuck on December 1 was Tom Walker, a man she had met three weeks earlier.[5] The two had a date for the following Monday, December 5. Mr. Walker testified that he left work at 9:40 a.m. that day to attend a funeral in Spokane Valley and left the funeral at 10:30 a.m. to return to work. He texted Ms. Starbuck about 10:50 a.m. to ask how her day was and tell her he had attended a funeral. She replied at 12:10 p.m., asking if he would like to meet her for lunch at 1:00 p.m. He responded that he could not as he needed to be at work. At 12:19 she texted

---

[4] Y-STR is a type of DNA testing specific to the Y chromosome, which is only present in males. Although the test is considered reliable, it is less discriminating and cannot narrow the identification to a particular individual male.

[5] Between 8:20 a.m. and 8:47 a.m. on December 1st, the two exchanged sexually explicit text messages. That evidence was excluded by the pre-trial ruling. Cell tower records established that Mr. Walker was nowhere near Deer Park when he communicated with Ms. Starbuck's phone that day.

5

back asking if he was on his way for lunch. He responded at 12:26 that he could not. She did not respond to his texts.

Ms. Starbuck's cell phone also showed calls and texts to and from "John Wilson" on December 1, 2011. John "Wilson" was actually John Kenlein, a married Spokane teacher who had met Ms. Starbuck on a dating website in mid-September 2011 and began engaging in sexual relations with her. He testified that he had plans to meet with Ms. Starbuck on December 1, 2011, and had arrived at her house at 10:30 a.m. that day.[6] When she did not respond to his knocking, he unsuccessfully tried to call her a couple of times from a pay phone in Deer Park.[7] He then drove to Whitworth College and tried to "instant message" her from a college computer, but got no response. Just after noon, he began to receive texts from Ms. Starbuck's cell phone on the public computers at Whitworth or at a Spokane County Library. She stated that she had been eating and asked if he had come by. He responded that he had been to her house and asked if she was coming back soon. He then texted that he would see her at around 10:30 that night. At 1:17 p.m., Ms. Starbuck's cell phone texted back, "No tonight i hav[e] a headache [ ]and i will have clay take the kids." Mr. Kenlein then texted, "closer to 9:30?" The final text from Ms. Starbuck's cell phone to Mr. Kenlein was sent at 1:32 p.m.: "Nope

---

[6] Much of Kenlein's testimony was corroborated by receipts that helped establish the timeline of his activities that day.

[7] Kenlein did not have a cell phone and did not text.

an[o]ther hour." Mr. Kenlein drove back to Ms. Starbuck's house late that night, but found the house dark and he could not get her to respond to phone calls or knocking.

The prosecutor filed charges against Mr. Starbuck on February 9, 2012. The document alleged one count of aggravated first degree murder, with five aggravating factors, and one count of sexually violating human remains. The prosecutor did not file notice of a special sentencing proceeding (death penalty). Trial eventually was delayed until spring, 2013.

The court heard a series of motions-in-limine by the parties on the eve of trial. As relevant to this appeal, the court granted the State's motions to exclude "other suspects" evidence and evidence concerning the victim's sexual activities with men she was dating. The court found that Mr. Starbuck was unable to sufficiently connect either Mr. Walker or Mr. Kenlein to the crime, and the dating history was unduly prejudicial to the State while offering little or no value to the defense.

Jury trial was conducted in May and June, 2013. The defense concentrated its closing argument on the unidentified DNA and inadequacies in the sheriff's investigation, pointing to a large number of items in the house that were not tested. The defense also pointed to Mr. Kenlein as a possible killer:

> We heard the state a moment ago talk about, well, only Clay would know the—the content of those text messages [sent to the children]. Only Clay would—would say things like dad or Marsh [(the nickname of the youngest son)]. That's not what we heard from John Wilson [(Mr. Kenlein's alias)]. That's not what we heard from John Kenlein. He said he

7

knew the kids' names and he knew the kids' schedule. Why? So that they could arrange their dates, so that they could arrange their sexual encounters. John Wilson—John Kenlein knew this. Chanin didn't even know his real name.

The state asked you who else could have done this. Ladies and gentlemen, John Kenlein was there four times that day. He didn't see anything. He was there at 10:30. Now this is in the time frame where the state believes Ms. Starbuck is still alive. So we're clear, ladies and gentlemen, you are the sole judges of credibility, and I leave Mr. Wil—I mean, Mr. Kenlein's credibility in your hands. Interesting about Ms. Starbuck's cell phone is what I guess I'll call the gloves-on versus gloves-off theory. If we're talking about Ms. Starbuck's phone, which to a hundred percent certainty does not contain Mr. Starbuck's DNA, but does have the DNA of another man, an unidentified man. Now, the state will say, well, obviously his [Mr. Starbuck's] DNA isn't on the phone; he's wearing gloves. They don't explain why the other male DNA is there.

Report of Proceedings (RP) at 2716-17.

The prosecution insinuated that Mr. Starbuck had faked his car troubles[8] and lay in wait in the house while Ms. Starbuck took the children to school, and then assaulted her after her return. He used gloves to text message the two men in order to suggest Ms. Starbuck was still alive. The alleged motives were rage over the victim's lifestyle and financial—his support and maintenance obligations tallied $4,700 a month and he was already in arrears.

The jury convicted Mr. Starbuck as charged on the two crimes and found that four of the five aggravating factors were present. The court imposed the mandatory sentence

---

[8] Mr. Starbuck had told detectives he walked the same route four times that day (twice to and from his disabled car), but surveillance videos never showed him on the route.

8

of life in prison without possibility of parole for the murder conviction. Mr. Starbuck then timely appealed to this court.

## ANALYSIS

Mr. Starbuck raises four arguments in this appeal. We first address the contention that the court erred in excluding his "other suspects" evidence before turning to the remaining three contentions. In order of our review, those issues are whether the evidence supported the verdicts, whether the 911 recording should have been admitted into evidence, and whether the prosecutor committed misconduct in closing argument.

*Other Suspects Evidence*

Mr. Starbuck argues that the trial court erred in prohibiting him from presenting and arguing "other suspects" evidence to the jury. While it appears that the exclusion order was not strictly followed, we also conclude that the trial court properly determined that a sufficient foundation was not presented to admit the evidence.

The trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. *State v. Franklin*, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014); *State v. Strizheus*, 163 Wn. App. 820, 829, 262 P.3d 100 (2011), *review denied*, 173 Wn.2d 1030 (2012). "An erroneous evidentiary ruling that violates the defendant's constitutional rights, however, is presumed prejudicial unless the State can show the error was harmless beyond a reasonable doubt." *Franklin*, 180 Wn.2d at 377 n.2. Both the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington

9

Constitution guarantee the criminal defendant's right to present a defense. *Strizheus*, 163 Wn. App. at 829-30. But a criminal defendant does not have a constitutional right to present irrelevant or inadmissible evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983).

As noted in *Franklin*, a trial court's exclusion of "other suspect" evidence is an application of the general evidentiary rule that excludes evidence if its probative value is outweighed by such factors as unfair prejudice, confusion of the issues, or potential to mislead the jury. 180 Wn.2d at 378 (citing *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). Before the trial court will admit "other suspect" evidence, the defendant must present a combination of facts or circumstances that points to a nonspeculative link between the other suspect and the crime. *Franklin*, at 381. The standard for the relevance of such evidence is whether it tends to connect someone other than the defendant with the charged crime. *Id.* The inquiry "'focuse[s] upon whether the evidence offered tends to create a reasonable doubt as to the *defendant's* guilt, not whether it establishes the guilt of the *third party* beyond a reasonable doubt.'" *Id.* (quoting *Smithart v. State*, 988 P.2d 583, 588 (Alaska 1999)). Additionally, the probative value of "other suspect" evidence must be based on whether it has a logical connection to the crime, not based on the strength of the State's case. *Id.* at 381-82.

10

Washington permits a criminal defendant to present evidence that another person committed the crime when he can establish "a train of facts or circumstances as tend clearly to point out someone besides the accused as the guilty party."[9] *State v. Downs,* 168 Wash. 664, 667, 13 P.2d 1 (1932); *State v. Rehak,* 67 Wn. App. 157, 162, 834 P.2d 651 (1992), *cert. denied,* 508 U.S. 953 (1993). The United States Supreme Court has approved this standard for admitting "third party guilt" evidence. *Holmes,* 547 U.S. at 327.[10] When the State's case is entirely circumstantial, the *Downs* rule is relaxed to an extent to allow a reply in kind: the "defendant may neutralize or overcome such evidence by presenting sufficient evidence of the same character tending to identify some other person as the perpetrator of the crime." *State v. Clark,* 78 Wn. App. 471, 479, 898 P.2d 854 (citing *Leonard v. Territory of Wash.,* 2 Wash. Terr. 381, 396, 7 P. 872 (1885)), *review denied,* 128 Wn.2d 1004 (1995); *accord, State v. Hilton,* 164 Wn. App. 81, 99, 261 P.3d 683 (2011).

As the proponent of the evidence, the defendant bears the burden of establishing relevance and materiality. *State v. Pacheco,* 107 Wn.2d 59, 67, 726 P.2d 981 (1986). In establishing a foundation for admission of "other suspect" evidence, the defendant must

---

[9] Evidence of possible motive alone is insufficient to establish this nexus. *State v. Kwan,* 174 Wash. 528, 533, 25 P.2d 104 (1933); *State v. Condon,* 72 Wn. App. 638, 647, 865 P.2d 521 (1993), *review denied,* 123 Wn.2d 1031 (1994).

[10] *Holmes* cited *Thomas* as following this rule. *Id.* at 327 n.*.

show a clear nexus between the other person and the crime. *State v. Rafay*, 168 Wn. App. 734, 800, 285 P.3d 83 (2012), *review denied*, 176 Wn.2d 1023, *cert. denied*, 134 S. Ct. 170 (2013). The proposed evidence must also show that the third party took a step indicating an intention to act on the motive or opportunity. *Id.*

The focus, then, is on whether Mr. Starbuck sufficiently connected Walker or Klenein to the crime. As earlier cases confirm, the trial judge correctly concluded that the connection was not made.

Division One nicely analyzed this problem in its recent decision in *State v. Wade*, -- Wn. App. --, 346 P.3d 838 (2015). As here, there the defendant was convicted of murder in the strangulation death of a woman; his counsel had argued that the police investigation was flawed for failure to investigate other suspects. *Id.* at 845. The defendant also argued that his right to present a defense was violated by the trial court's exclusion of evidence and argument that an ex-boyfriend committed the crime. *Id.* at 845-46. The former boyfriend had previously assaulted the victim by strangling her several years earlier, was subject to a no-contact order, and left voicemail "implied threats" three months before the killing. *Id.* at 846. Extensive testing did not turn up any of the former boyfriend's DNA or fingerprints at the crime scene—the victim's apartment. He also did not appear on the security camera recordings for the apartment building. *Id.* at 846-47.

In the absence of any evidence putting the ex-boyfriend at the scene, Division One agreed with the trial court that the other suspects evidence was not admissible, noting that the trial court "properly focused solely on the connection of the proffered other suspect evidence to the crime." *Id.* at 847. The fact that the ex-boyfriend was a "bad actor" with a violent history and "a motive to harm her" was not enough. *Id.* The court noted that there was "no physical evidence connecting" the boyfriend to the murder and "no evidence" that he "was anywhere near" the "apartment when the crime occurred." *Id.* Accordingly, there was no evidence leading to a "nonspeculative" link between the crime and the ex-boyfriend. *Id.* at 848.

*Franklin*, discussed in detail in *Wade*, provides a contrasting example of sufficient evidence to link another suspect to a crime. *Franklin* involved a prosecution for "cyberstalking-related crimes." 180 Wn.2d at 372. There the defendant blamed his live-in girlfriend for the cyberstalking. As the court summarized the case, the live-in girlfriend:

> . . . had the motive (jealousy), the means (access to the computer and e-mail accounts at issue), and the prior history (of sending earlier threatening e-mails to [the victim] regarding her relationship with Franklin) to support Franklin's theory of the case.

*Id.* at 372. Under those facts, it was error to exclude evidence that she had sent the threatening e-mails to the victim as there was a sufficient nexus between the other suspect and the crime. *Id.* at 373.

Other post-*Holmes* cases have involved fact patterns where no connection was established. In *Rafay*, the defendant had provided evidence that violent Muslim groups had marked the victim for assassination, but provided no evidence that any member of the groups had been near the scene or acted upon the motive; the evidence therefore was properly excluded. 168 Wn. App. at 800-01. In *Hilton*, this court found that other suspect evidence was properly excluded where there was only a motive and proximity to the crime, but no evidence that the other suspect actually had the specialized weaponry used to kill the victims or had been at the scene during the time of the killings. 164 Wn. App. at 101.

*Strizheus* presents yet another example of insufficient connection between the other suspect and the crime. In a prosecution for assault and attempted murder, the victim initially identified her husband as the attacker, but at trial could not remember who had attacked her. 163 Wn. App. at 828. Subsequent to that attack, the couple's son told 911 operators that he should be in jail for something bad he had done; he later assaulted his mother. *Id.* at 824-25. The court concluded that "there was no evidence establishing a nexus" between the son and the attempted murder. *Id.* at 832. He was not at the scene, had never been identified as the attacker by the victim, and there was no evidence of any step taken by the son to commit the act. *Id.*

These cases confirm the trial court's reasoning here. Mr. Starbuck contends that he should have been permitted to put on evidence of Ms. Starbuck's sexual relationships with other men and the sexually explicit text messages sent by Mr. Walker. The trial

14

court concluded that such evidence did not "provide the clear connection" between the "alternative named suspects and the homicide." RP at 119-120. The noted case law is in accord with that conclusion. The fact that Ms. Starbuck may have had sexual relationships with more men than the jury learned[11] about simply does not enlighten anyone concerning the identity of her killer. The jury already heard that at least three unidentified males had left DNA in, on, or near her body at the crime scene. Knowing that she may have been sexually involved with additional unidentified men who were not connected to the crime scene could only lead to speculation about her activities, but it presented no information about the issues before the jury. That she knew many men did not further identify which one killed her.[12]

The Walker text similarly does not assist in identifying him as the killer. The primary probative value of the text, given that the victim was posed partially in conformance with the photo requested therein, was that the killer had access to the victim's phone and used the information therein, clumsily, to cast suspicion toward

---

[11] In addition to the unidentified male DNA found in the vaginal wash, Mr. Kenlein testified to having sexual relations with Ms. Starbuck a half dozen times, including twice at her residence. No trace of his DNA was ever found at the scene.

[12] Appellant appears to implicitly assume that there is a connection between multiple sexual relationships and murder, thus making his evidence relevant, although he presents no evidence or convincing argument in support of this position. It is no more relevant than whether the victim worked for an organization with a large number of employees or a small number.

Walker. It did not put him at the scene—indeed, the phone records put him well away from Deer Park the entire day; he had no opportunity to commit the crime. Walker's photograph request is not suggestive of a motive for murder or of any violent intention at the least. It also does not constitute a step toward committing murder. In short, the text does nothing to suggest Walker committed the crime.

Mr. Starbuck argues that consideration of the strength of Walker's alibi is forbidden by *Holmes*. His argument misconstrues that case. There, South Carolina had a rule in derogation of the common law rule followed in this state – and approved[13] by the United States Supreme Court in *Holmes*—which prohibited other suspect evidence when the government's case was strong. 547 U.S. at 323-324. In other words, the common law rule could be ignored, despite the defendant's showing, if the State's case against the defendant was strong enough. The *Holmes* prohibition, however, was not directed at governmental evidence that weighed on the strength of the defendant's other suspects evidence. It simply prohibited consideration of unrelated evidence when making that determination. The trial court was free to consider evidence introduced by the State on the topic—Mr. Walker testified where he was during the day and the phone and employment records backed him up. The trial court properly used that information while

---

[13] 547 U.S. at 327, n.*.

16

determining whether Mr. Starbuck made a nonspeculative showing that Mr. Walker could have committed the crime.

*Wade* presents another example of the trial court considering all of the relevant evidence in adjudging whether a sufficient showing had been made to blame another named person for the crime. The court noted the complete absence of fingerprints and DNA from the crime scene as well as the ex-boyfriend's absence from the surveillance video in its assessment of the trial court's decision to exclude the other suspect evidence. *Wade*, 346 P.3d at 847. In the course of its analysis, *Wade* then went on to reject the view of *Holmes* that Mr. Starbuck takes here. *Id.* at 848. Consistent with *Wade*, we agree that the trial court did not consider the strength of the State's case when it weighed the competing evidence concerning the feasibility of the other suspect having committed the crime.

*Holmes* requires that only relevant factors be taken into consideration when adjudging the admissibility of this type of evidence. It does not limit which party's evidence is considered. The trial judge here did not violate *Holmes*.

The trial court also correctly concluded that the other suspect evidence did not rise above the level of speculation. The trial court did not abuse its discretion in determining that the prejudice to the State's case substantially outweighed any probative value of the excluded evidence. The defendant's desire to try the victim's lifestyle was irrelevant because he could not present any nonspeculative evidence that someone else could have

17

committed the crimes. The defense was able to argue from the evidence, and did, that

Kenlein was as likely a suspect as anyone else given his repeated visits to the home that

day. But there was no other evidence that suggested that someone else committed the

crimes. Whether or not the victim was dating multiple other men simply did not inform

the jury about the identity of her killer.

There was no error in excluding the evidence.

*Sufficiency of the Evidence*

Mr. Starbuck challenges the sufficiency of the evidence to support the convictions,

arguing that the identity of the killer was not established and that there was no evidence

that anyone had sexual intercourse with the body after death. Properly viewed, the

evidence supported the jury's determinations.

Long settled standards govern our review of these claims. Evidentiary sufficiency

challenges are reviewed to see if there was evidence from which the trier of fact could

find each element of the offense proven beyond a reasonable doubt. *State v. Green*, 94

Wn.2d 216, 221-22, 616 P.2d 628 (1980) (citing *Jackson v. Virginia*, 443 U.S. 307, 319,

99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). The reviewing court will consider the evidence

in a light most favorable to the prosecution. *Id.* Reviewing courts also must defer to the

trier of fact "on issues of conflicting testimony, credibility of witnesses, and the

persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970

(2004). "Credibility determinations are for the trier of fact and are not subject to review." *Id.* at 874.

Although circumstantial, the identification evidence was sufficient to support the jury's determination. The DNA recovered from the victim's fingernails, face, and neck—the three areas of the body most likely contacted by the killer during the struggle—matched that of Clay Starbuck and his sons, none of whom lived in the house and none of whose DNA would be expected to be found all over the body.[14] Clay's alibi was weak and wounded by his failure to appear on the private security video that he supposedly passed four times that day. Suspiciously, his telephone was off during the day and conveniently turned on again shortly after Chanin's was turned on. Someone familiar with the family used Chanin's phone to text others, even using family nicknames in the communications. That person also texted Walker and tried to steer him into a meeting, behavior that strongly suggested that someone other than Chanin was controlling the telephone—someone who was trying to cast suspicion on other men. The killer was quite familiar with Chanin's life and acted upon that information. By constantly and needlessly volunteering information about Chanin's relationships with numerous people, Clay Starbuck showed knowledge of her affairs and was the most

---

[14] The only boy who lived in the house did not have this DNA profile.

19

likely person to use that information to ensnare others. He also appeared to be attempting to steer a future investigation away from himself.

Clay Starbuck also had the clearest motives. The dissolution caught him at a bad time financially while he was recovering from surgery, leading to the judgment for support arrearages. He was angry about the financial aspects of the dissolution and angry about the custody situation. He also was angry about Chanin's lifestyle and appeared obsessed with her life after the dissolution. The killer who battered her to death—eleven broken ribs and numerous bruises—was someone who was extremely angry at Chanin. That anger did not dissipate with her murder. He then had to pose her in a sexually explicit manner, thus demonstrating further anger about her lifestyle. Clay Starbuck was the one person who had repeatedly expressed his anger about her lifestyle. That anger was not shared by the men who currently were dating her.

Clay Starbuck had the motives and the opportunity, and was the one best situated to attempt the cover-up that delayed discovery of the crime for two days. This was a classic case of circumstantial evidence, variations of which have been seen in murder cases throughout the centuries. It was sufficient to permit the jury to identify Clay Starbuck as the killer.

There also was sufficient evidence of sexual intercourse to support the jury's verdict on the sexual violation charge. The coroner testified that the dildo had been in the victim's anus at the time of her death and then removed and placed in her vagina. Sexual

intercourse is defined, in part, for purposes of this crime, as any post-mortem penetration of the vagina. RCW 9A.44.105(2)(a). The coroner's testimony expressly supplied this element of the offense. The jury had sufficient evidence to conclude that the crime was proven.

The evidence allowed the jury to find, beyond a reasonable doubt, the contested elements of these crimes.

*911 Recording*

Mr. Starbuck next argues that the court violated his confrontation clause rights by admitting the recording of the 911 call, contending that the recording constituted testimonial hearsay. For three reasons, it did not.

Modern confrontation clause analysis is driven by the decision in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). There the court concluded that the right of confrontation extended only to "witnesses" who "bear testimony" against the accused. *Id.* at 51. This "testimonial" hearsay rule reflected "an especially acute concern with a specific type of out-of-court statement." *Id.* "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.*

The trial court concluded that the recording did not contain any statements. At most, the 35 seconds of sounds suggests a struggle, not a declaratory statement. In the absence of an actual statement, there was not testimony. If there was a statement on the

21

recording, it certainly was not testimonial. There was no indicia of formality that suggests an intent to bear testimony. Finally, a call for emergency aid is not a testimonial statement under *Crawford*. *See Michigan v. Bryant*, 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011); *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

For all three reasons, the constitutional challenge to the admission of the 911 recording is without merit. There was no error.

*Closing Argument*

Finally, Mr. Starbuck contends that the prosecutor committed misconduct in closing argument by saying that the DNA matched his profile, suggesting that there may have been an accomplice, implying that Clay Starbuck was lying about Chanin's lifestyle, and characterizing the 911 recording as a call for help. These unchallenged statements did not amount to misconduct.

"A defendant claiming prosecutorial misconduct bears the burden of establishing the impropriety of the prosecuting attorney's comments and their prejudicial effect." *State v. Corbett*, 158 Wn. App. 576, 594, 242 P.3d 52 (2010) (citations omitted). A reviewing court must first determine if the comments were improper and must assess the challenged comments in context. *Id.* "Absent a proper objection and a request for a curative instruction, the defense waives a prosecutorial misconduct claim unless the comment was so flagrant or ill intentioned that an instruction could not have cured the prejudice." *Id.* In

22

this case, counsel did not object to the alleged misconduct; thus, this court reviews the statements for incurable flagrancy.

The primary statements in question came from the opening paragraph of the prosecutor's rebuttal argument:

> With everything that Mr. Reid just said about what he claims wasn't tested and why, how does the defendant's DNA, the match of it on Ms. Starbuck, how does that exclude the defendant? I would submit it doesn't. He speaks of another contributor on the DNA. It's not known whether or not the perpetrator of this crime acted alone. But one thing is known, a match to the defendant's DNA is found on Ms. Starbuck. That does not exclude the defendant.

RP at 2735-36.

It was not improper to say that the DNA profile matched Clay Starbuck's profile. That is, in fact, what the expert testified to on cross-examination by the defense; the expert also told the jury that the test was not powerful enough to identify just a single individual as the contributor. RP at 2474-75. The prosecutor did not err in using the same language as the expert witness.

In context, there also was no error in using the word "matched" or in referencing the possibility of additional perpetrators. The argument is a clear response to defense counsel's claim that additional testing would have shown that other males had left DNA in the house. The prosecutor properly noted that additional DNA contributors did not explain how Mr. Starbuck's DNA turned up in the most incriminating areas and did not exonerate him, even as evidence of additional perpetrators would not have excluded the

23

Starbuck male DNA match. This was not a case of the prosecutor overstating the evidence or injecting a new theory of liability. He simply pointed out that the defense theory of inadequate investigation failed to explain away the evidence against Clay Starbuck.

The prosecutor likewise did not err in pointing out that Mr. Starbuck was constantly telling individuals in the community, usually at times and circumstances when it was not a natural topic of conversation, about his ex-wife's lifestyle. Whether or not he was inventing this image, he certainly was trying to spread and sell it to others. The importance of this information was not whether it accurately reflected the victim's lifestyle, but the fact that the defendant communicated it to so many others without any apparent need to do so. This strongly suggested an early effort to paint a dangerous lifestyle and throw future suspicion off Clay Starbuck. This was evidence of planning and premeditation, two elements the prosecutor needed to prove at trial.

Finally, little need be said about the characterization of the 911 recording as a call for help. That was a reasonable inference from the evidence. People normally call 911 for emergency assistance, and a person who contacts 911 while being assaulted would understandably be seeking aid. The importance of the call was in helping establish a timeframe for the crime. The prosecutor could properly reference that evidence and draw a reasonable inference about the purpose of the call. A person who misdialed 911 would be likely to stay on the line and explain the error rather than turn off her telephone.

24

No. 31845-1-III
*State v. Starbuck*

For all of those reasons, the prosecutor did not commit misconduct in his closing argument. But, even if some of the statements were capable of being misconstrued, a timely objection and request for judicial assistance would have cured any misconceptions about the prosecutor's statements. None of these alleged errors were so egregious that they were beyond cure.

For all of these reasons, we conclude that there was no prosecutorial misconduct. This claim is without merit.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Brown, A.C.J.

_____
Lawrence-Berrey, J.

25