IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                    Respondent,<br><br>          v.<br><br>SOREN RICHARD OLSEN, II,<br><br>                    Appellant. | No. 84330-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — Soren Olsen challenges his convictions of two counts of possession of a controlled substance with intent to deliver, each with a firearm enhancement, and one count of unlawful possession of a firearm in the first degree. He argues the trial court erred by denying his motion to dismiss those charges based on law enforcement's failure to preserve the car in which Olsen was found with the controlled substances and the firearm. He also argues the evidence was insufficient to prove intent to deliver. Olsen raises additional issues in a statement of additional grounds for review. We affirm.

I.    FACTS

In late 2021, Officer Jon Flaherty of the Mount Vernon Police Department (MVPD) arrested Olsen on a Department of Corrections (DOC) warrant after finding him asleep in a car. Flaherty later testified that in a search incident to arrest, he found in Olsen's pockets a significant amount of cash and a large quantity of

drugs, which tested positive for methamphetamine and fentanyl.  In a subsequent search of the car, Flaherty found paraphernalia that he testified is typically associated with drug sales, including an unopened box of baking soda, which can be used to dilute methamphetamine.  He also found a revolver inside a bag in front of the driver's seat, where Olsen had been sitting.

The State charged Olsen with one count of possession of fentanyl with intent to manufacture or deliver, while armed with a firearm (Count I), one count of possession of methamphetamine with intent to manufacture or deliver, while armed with a firearm (Count II), one count of escape in the second degree (Count III), and one count of unlawful possession of a firearm (UPOF) in the first degree.

In April 2022, Olsen moved to dismiss the charges against him.  He argued that dismissal was required because MVPD allowed the car to be declared abandoned and towed from MVPD's lot three days after Olsen's counsel appeared and requested discovery.[1]  The trial court denied the motion and a jury found Olsen guilty as charged.  He appeals.

## II.    ANALYSIS

### A.    Motion to Dismiss

Olsen argues the trial court erred by denying his motion to dismiss based on MVPD's failure to preserve the car.  Because Olsen does not establish that MVPD acted in bad faith, we disagree.

"The Fourteenth Amendment [to the United States Constitution] requires

---

[1] Although Olsen's trial and appellate counsel suggest the car was "destroyed," and at least one witness suggested it was sent to "salvage," the record before us does not identify the ultimate fate of the car.

that criminal prosecutions conform with prevailing notions of fundamental fairness, and that criminal defendants be given a meaningful opportunity to present a complete defense." State v. Wittenbarger, 124 Wn.2d 467, 474, 880 P.2d 517 (1994). To comport with due process, the prosecution has a duty to preserve evidence for use by the defense. Id. at 475.

This duty, however, is not absolute. Id. (observing that the United States Supreme Court "has been unwilling to 'impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " (quoting Arizona v. Youngblood, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988))). If evidence is "material exculpatory evidence," the State's failure to preserve it requires dismissal. State v. Groth, 163 Wn. App. 548, 557, 261 P.3d 183 (2011). But if evidence is merely "potentially useful"—i.e. evidence " 'of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant' "—then the State's failure to preserve it requires dismissal only if the State acted in bad faith. Id. (quoting Youngblood, 488 U.S. at 57). We review de novo whether evidence was materially exculpatory or merely potentially useful. State v. Burden, 104 Wn. App. 507, 512, 17 P.3d 1211 (2001).

Olsen does not argue that the car was material exculpatory evidence.[2] Instead, he argues that it was potentially useful and we agree. As Olsen points

---

[2] As such, we need not address those portions of the State's brief that either (1) argue the car was not material exculpatory evidence or (2) appear to conflate the two standards. Because our review is de novo, we also need not defer to the trial court's determination that it was "speculative" whether the car was potentially useful.

out, the car *was* the crime scene, which is often helpful in understanding how evidence relates holistically. Further, additional analysis of the interior of the car could have corroborated Olsen's claim that the baking soda was not used to dilute drugs but had been sprinkled in the car to deodorize it.[3] In short, Olsen potentially could have obtained at least some "exonerating" evidence after testing the car and, to that extent, it was "potentially useful." Youngblood, 488 U.S. at 57-58.

The State does not contest the car was potentially useful and, instead, argues that Olsen had "comparable evidence," including witness testimony and photographs of the car and its contents. But that argument seeks to replace the "potential usefulness" standard with an inquiry into whether this evidence is duplicative or its exclusion prejudicial, which is not the standard and for which the State provides no support.

That said, although the car was potentially useful evidence, Olsen still must show, to be entitled to relief, that the State failed to preserve it in bad faith.[4] Olsen bears the burden to show the State's bad faith. United States v. Dring, 930 F.2d 687, 694 (9th Cir. 1991); see also Wittenbarger, 124 Wn.2d at 477 ("[F]ailure to preserve 'potentially useful' evidence does not constitute a denial of due process

---

[3] Olsen also argues the car's destruction prevented him from supporting his testimony that his son told him he placed the revolver in a secure storage box in the trunk. But Olsen did not so testify.

[4] This standard, which derives from Arizona v. Youngblood, 488 U.S. 51, 57, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), arguably "places defendants in the nearly impossible position of having to prove the State's failure to preserve evidence was an act of bad faith." State v. Ortiz, 119 Wn.2d 294, 317, 831 P.2d 1060 (1992) (Johnson, J., dissenting). Nevertheless, we are bound by Youngblood and by Wittenbarger, in which our Supreme Court held that the Washington Constitution provides no greater protection in the context of the preservation of evidence. State v. Wittenbarger, 124 Wn.2d 467, 481, 880 P.2d 517 (1994).

unless a criminal defendant can show bad faith on the part of the State."). To satisfy this burden, Olsen must show that MVPD's actions were improperly motivated by " 'put[ting] forward specific, nonconclusory factual allegations that establish improper motive.' " State v. Armstrong, 188 Wn.2d 333, 345, 394 P.3d 373 (2017) (quoting Cunningham v. City of Wenatchee, 345 F.3d 802, 812 (9th Cir. 2003)).

Olsen does not make this showing.[5] He relies almost exclusively on the simple fact that the car was towed from MVPD's lot three days after Olsen's counsel filed a notice of appearance and request for discovery. And he cites People v. Newberry, 166 Ill. 2d 310, 652 N.E.2d 288, 209 Ill. Dec. 748 (1995), for the proposition that this timing establishes bad faith "per se." But Newberry is not only nonbinding, it is distinguishable. There, alleged cocaine seized from the defendant was destroyed after defense counsel filed a motion that specifically "[i]ncluded . . . a request to examine all tangible objects that had been seized from [the defendant]." Newberry, 652 N.E.2d at 290. In other words, Newberry made a specific request that put the State "on notice that the evidence must be preserved." Id. at 292. It was that fact that absolved the defense from making a "showing of bad faith," and underlies the presumption which Olsen asks us to create for the first time under Washington law. Id.

Here, by contrast, even Olsen acknowledges that counsel's notice of

---

[5] Olsen asserts that this court reviews the trial court's bad faith determination de novo. Because the State does not argue that a more deferential standard of review applies, we assume without holding that Olsen is correct, and we apply de novo review.

appearance and request for discovery was "generalized," and he points to nothing therein that can be construed as a specific request to preserve or examine the car. Cf. State v. Boyd, 29 Wn. App. 584, 589, 629 P.2d 930 (1981) (bad faith established where police destroyed a tape recording after the defendant made a specific request for it that identified the tape and gave the prosecutor and police notice of exactly what the defense desired).

Furthermore, our Supreme Court has held that " '[t]he presence or absence of bad faith . . . turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' " Armstrong, 188 Wn.2d at 345 (alteration in original) (quoting Cunningham, 345 F.3d at 812). Olsen points to nothing in the record indicating MVPD believed the car, which had been photographed, still had exculpatory value when it was towed away. It was not registered to Olsen and, as even he acknowledged below, before releasing it, the MVPD property custodian reviewed ownership documents and reached out to the car's apparent owner, "presumably to request the owner to pick-up the car from the MVPD property lot." At most, MVPD was negligent or incompetent in allowing the car to be towed after Olsen's counsel filed his generalized request for discovery, but that is not enough to show bad faith, as defined in our precedent. Id. at 346. The trial court did not err in denying Olsen's motion to dismiss.

B.     Sufficiency of the Evidence

Olsen next argues that the evidence was insufficient to prove an intent to

deliver with regard to Counts I and II.[6]  Again, we disagree.

The State "bears the burden of proving every element of every crime beyond a reasonable doubt." State v. Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018).  When a defendant challenges the sufficiency of the evidence presented to meet this burden, "he or she admits the truth of all of the State's evidence." State v. Cardenas-Flores, 189 Wn.2d 243, 265, 401 P.3d 19 (2017).  "Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." Id.

Flaherty testified that the methamphetamine found on Olsen's was enough for up to "28 different uses," and that the fentanyl was "more than a month's supply."  This testimony alone would not have been sufficient to support an inference of intent to deliver.  See State v. Zunker, 112 Wn. App. 130, 135, 48 P.3d 344 (2002) (mere possession of drugs, even in an amount greater than is usual for personal use, does not raise an inference of an intent to deliver).  But the State also presented evidence that additional items found on Olsen and in the car were consistent with drug sales, including a large amount of cash consisting mostly of twenty-dollar bills, unused baggies, numerous rubber bands, and the firearm, which Flaherty testified could be a source of security because "[y]ou can show it, and word gets around that you have one, then people would be less likely to attempt to rob you."  A rational juror could have inferred, based on these additional

---

[6] Although the State charged Olsen with possession with intent to manufacture or deliver, the jury was instructed only with regard to intent to deliver.

factors beyond the quantity of drugs at issue, that Olsen had an intent to deliver.

Olsen disagrees, relying on his testimony that the at-issue drugs belonged to Olsen's son and his girlfriend, that Olsen never intended to sell them, and that the cash was money he and his wife had earned from recent work. But it was up to the jury to resolve any contradictions between Olsen's testimony and the State's evidence, and we will not revisit the jury's resolution of those contradictions. See State v. Campos, 100 Wn. App. 218, 224, 998 P.2d 893 (2000) ("The jury resolves contradictory evidence by making credibility determinations[, and w]e do not redecide credibility determinations."). Thus, Olsen's challenge fails.

C.      Statement of Additional Grounds for Review

Olsen has submitted a statement of additional grounds for review (SAGR) under RAP 10.10. A SAGR serves to ensure that an appellant can raise issues in their criminal appeal that may have been overlooked by their attorney. Recognizing the practical limitations many incarcerated individuals face when preparing their own legal documents, RAP 10.10(c) does not require that a SAGR be supported by references to the record or citations to authority. But it does require that the appellant adequately "inform the court of the nature and occurrence of alleged errors" and relieves the court of any independent obligation to search the record in support of the appellant's claims. RAP 10.10(c).

Olsen raises a number issues in his SAGR, but as further discussed below, none establishes an entitlement to appellate relief.

1. "Other Suspect" Theory

Olsen first asserts that various acts and omissions by the court, the

8

prosecutor, and his own counsel precluded him from advancing an "other suspect" theory that Olsen's son's girlfriend, Tabitha Tibbetts, who also had access to the car, was actually the guilty party. But Olsen's theory is based on an incorrect premise—that only one person could have possessed the items the jury ultimately attributed to Olsen. To the contrary, and as the jury was properly instructed, possession need not be exclusive. State v. Weiss, 73 Wn.2d 372, 374-75, 438 P.2d 610 (1968) (that dominion and control is not exclusive does not preclude a conviction for possession). Consequently, evidence tending to show that Tibbetts had "equal access to [the] vehicle," as Olsen puts it, would not have supported an "other suspect" theory. Cf. State v. Starbuck, 189 Wn. App. 740, 751-52, 355 P.3d 1167 (2015) (other suspect evidence is evidence that someone else was the perpetrator of the crime).

   2. Judicial Bias

After the jury returned its verdict, Olsen moved for a new trial. He alleged that the trial judge "may have a conflict" because Olsen previously prevailed against the judge's former law firm in a civil suit. The judge determined there was no conflict. Olsen now renews his argument that judicial bias warrants a new trial; he also argues that once the alleged conflict was raised, the judge should have recused, and trial counsel was ineffective for not seeking recusal. But Olsen's allegations of bias depend on facts outside the record that cannot be considered in this direct appeal. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). And while Olsen speculates based on the trial judge's rulings that he was biased, "[j]udicial rulings alone almost never constitute a valid showing of bias." In

9

re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004); see also In re Pers. Restraint of Haynes, 100 Wn. App. 366, 377 n.23, 996 P.2d 637 (2000) (party asserting judicial bias must produce sufficient evidence demonstrating bias, such as personal or pecuniary interest; mere speculation is not enough).

3. Challenges to Statutes of Conviction

Olsen next argues that RCW 69.50.401, the possession statute he was convicted of violating, is unconstitutional because "knowingly is absent in this RCW." He relies on State v. Blake, but the statute at issue in Blake punished simple possession without any *mens rea* or proof of an intent to commit an unlawful act. See 197 Wn.2d 170, 180, 183, 481 P.3d 521 (2021). Blake does not apply to the statute Olsen was convicted of violating, which punishes possession *with intent to deliver*.

Olsen also points out that the firearm he was convicted of possessing was manufactured in 1861, and that the federal UPOF statute contains an exception for antique firearms manufactured before 1898. See 18 U.S.C. § 921(a)(3). He argues his conviction under Washington's UPOF statute violated equal protection. In support, he cites United States v. Aguilera-Rios, 769 F.3d 626 (9th Cir. 2014), United States v. Hernandez, 769 F.3d 1059 (9th Cir. 2014), and United States v. Benamor, 937 F.3d 1182 (9th Cir. 2019). But the issue in Aguilera-Rios and Hernandez was whether a prior UPOF conviction under California law, which does not recognize an exception for antique firearms, could serve as a basis for a removal order and a federal sentencing enhancement, respectively. See Aguilera-Rios, 769 F.3d at 637; Hernandez, 769 F.3d at 1062-63. And the issue in Benamor

was whether the defendant's knowledge of the non-antique status of a firearm was an element of the federal UPOF statute that the government had to prove. 937 F.3d at 1185. None of these cases stand for the proposition that Olsen's conviction under Washington's UPOF statute violates equal protection.

4. Jury Issues

After closing arguments, one of the 12 remaining jurors tested positive for COVID-19, and four others indicated they were unvaccinated or uncertain. The parties discussed options, and Olsen made clear that he would rather proceed with seven jurors than delay things. Olsen signed a written waiver and confirmed on the record that he wished to proceed with a seven-person jury. He now argues that his waiver should not have been allowed. But the prerequisites to a valid waiver, and in particular, "a personal statement from the defendant expressly agreeing to the waiver," were satisfied. State v. Stegall, 124 Wn.2d 719, 729, 881 P.2d 979 (1994).[7]

5. Firearm Issues

Olsen argues that photographic exhibits of the revolver show the State removed rust from it to make it appear operable. But the referenced exhibits are not in the record. See RAP 10.10(c) ("Only documents that are contained in the record on review should be attached or referred to in [a SAGR]."). In any case,

---

[7] Olsen also asserts that CrR 6.1(c), which allows a defendant to elect to continue with the remaining jurors when "a juror" is unable to continue, does not apply when *multiple jurors* are unable to continue. But given that even the state constitutional right to a 12-person jury can be waived, Olsen's reading of CrR 6.1 as "overriding" his knowing waiver is not persuasive, nor is his clam that trial counsel was ineffective for not advancing that reading of the rule.

Flaherty denied the revolver was cleaned, attributing its appearance in the photographs to lighting. Olsen's request that this court "look for [it]self" is a request to reweigh the evidence, which we will not do.

Olsen next points out that when the revolver was test fired, a cloth projectile was used, and it could not be found after the test fire. Olsen argues that as a result, the evidence was insufficient to prove that Olsen possessed a "firearm," i.e., "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." RCW 9.41.010(20). But both Flaherty and Olsen's weapons expert, who attended the test firing, testified that the revolver successfully discharged the cloth projectile, and that it fired properly. A rational juror could infer from this testimony that the revolver was a firearm. Cf. State v. Tasker, 193 Wn. App. 575, 594, 373 P.3d 310 (2016) ("In order to be a 'firearm' within the meaning of RCW 9.41.010, a device must be capable of being fired, either instantly or with reasonable effort and within a reasonable time.").

Olsen also relies on State v. Gurske, 155 Wn.2d 134, 118 P.3d 333 (2005), for the proposition that the presence, close proximity, or constructive possession of the revolver was not sufficient proof that he was "armed" with a firearm. But the firearm at issue in Gurske was behind the driver's seat in a zipped backpack that was not removable by the driver without exiting the car or moving to the passenger seat. Id. at 143. Here, by contrast, the State presented evidence that the revolver was in front of the driver's seat where Olsen had been sitting, in the same bag as other paraphernalia tending to show an intent to deliver.

Olsen's sufficiency challenges to his UPOF conviction and firearm

12

enhancements fail, as do his claims that trial counsel was ineffective for not asserting those challenges.

6. Ineffective Assistance of Counsel

In addition to the ineffective assistance claims addressed above, Olsen argues that counsel was ineffective for not bringing to the jury's attention inconsistences between Flaherty's testimony and the written report of Spencer Fox, a DOC officer Flaherty spoke to on the day of Olsen's arrest. But counsel did bring the inconsistences to the jury's attention during his opening statement, Flaherty's testimony, and Fox's testimony. Counsel also relied specifically on the inconsistencies between Flaherty's testimony and Fox's report to argue in closing that Fox's account corroborated Olsen's version of events. While Olsen argues that counsel should have done even more, he does not show that the decision not to was objectively unreasonable. Cf. State v. Stotts, 26 Wn. App. 2d 154, 165, 527 P.3d 842 (2023) (to overcome strong presumption of effective performance, defendant alleging ineffective assistance must show that counsel's representation fell below an objective standard of reasonableness under all the circumstances).

Olsen also argues counsel was ineffective for not bringing an alleged break in the chain of custody for the firearm to the court or the jury's attention. He provides a photo of the firearm, which he avers was trial exhibit 57 or 59, and points out that it shows a paper bag in the background dated December 7, 2021. He then says that because the firearm was seized on December 2, 2021, there is no explanation of its whereabouts from December 3 through 6. But Olsen does not articulate why the presence of a December 7, 2021 date on bag in the photograph

or Flaherty's testimony that he "manipulated" the firearm before logging it into evidence establishes a break in the chain of custody, much less that counsel was deficient for not so speculating. Cf. State v. Wilson, 83 Wn. App. 546, 555, 922 P.2d 188 (1996) ("The chain of custody rule provides that an exhibit is sufficiently identified when it is declared to be in the same condition as at the time of its initial acquisition.").

7. Prosecutorial Misconduct

Olsen argues that the prosecutor committed misconduct by engaging in witness tampering. He relies on an email in which the prosecutor informed multiple law enforcement officers that firearms enhancements had been charged, set out what the State would need to prove to support a guilty verdict on the enhancements, and asked if one of the officers could testify in that regard. To prevail on a claim of prosecutorial misconduct, Olsen must show that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). It is improper for an attorney, including a prosecutor, to counsel a witness to testify falsely. RPC 3.4(b). And as Olsen correctly points out, attempting to induce a witness to testify falsely constitutes the crime of witness tampering. RCW 9A.72.120(1)(a). But nothing in the prosecutor's email indicates she was urging the officers to give false testimony.

Olsen also argues that the prosecutor misinformed defense counsel about the State's theory as to the nexus between the firearm and Counts I and II. In particular, Olsen relies on defense counsel's representation that during a call with the prosecutor, the prosecutor "noted that maybe the antique gun was going to be

used in trade for drugs," and he argues that the State's failure to correct this "false disclosure" before trial prevented his counsel from properly preparing for trial. But Flaherty stated in a probable cause affidavit filed in December 2021 that he "know[s] it is common for drug dealers to carry firearms for protection." Olsen does not show that the prosecutor's later statement prejudiced defense counsel's ability to defend against the theory that the firearm was used for protection and not for trade.

8. Rejected Exhibits

Olsen argues that the trial court erred by not admitting Exhibit 83, which was his weapons expert's report. But the exhibit is not in the record, and Olsen does not reveal why it was rejected or explain why he believes that was error. Thus, he fails to establish a basis for relief.

Olsen also argues that the trial court erred by not admitting Exhibit 84, which also is not in the record. According to Olsen, it was a printout of a website stating that the federal government does not consider a gun manufactured before 1898 to be a firearm. The trial court excluded the exhibit on the basis that there was no proof Olsen ever actually accessed the website in question, but as the State also pointed out in objecting to the exhibit's admission, the printout would have shown at most that Olsen was ignorant of how Washington law defines a firearm. And ignorance of the law is not a defense to a UPOF charge. See State v. Williams, 158 Wn.2d 904, 916, 148 P.3d 993 (2006) (defendant is held to know the legal definitions set forth in the UPOF statute).

9. Challenges to Escape Conviction

Below, Olsen moved to dismiss Count III, the escape charge, arguing that the DOC form he signed upon his release to community custody did not warn him that absconding could lead not only to DOC sanctions, but also to a felony escape charge. The trial court determined that DOC did not mislead Olsen. Olsen argues that this determination was proven untrue at trial by testimony from two DOC officers. But Olsen did not renew his motion to dismiss based on the officers' testimony, and in any case, while the officers testified that Olsen's failure to report could be punished with sanctions, neither testified that sanctions were the *only* potential legal consequences, much less that they told Olsen so.

Olsen also points out that on July 13, 2021, he phoned his community corrections officer (CCO) to inform her he was stranded in Skagit County, and he asserts that under RCW 72.09.310, the statute he was convicted of violating, a person can avoid liability simply by contacting their CCO. The statute makes it unlawful for an inmate on community custody to "willfully discontinue[ ] making himself . . . available to [DOC] for supervision . . . by *failing to maintain contact* with [DOC]." RCW 72.09.310 (emphasis added). And although Olsen contacted his CCO by phone on July 13, 2021, the CCO testified that she otherwise never saw him or had another phone call with him. The evidence supports a finding that Olsen failed to maintain contact.

10. <u>Alleged *Brady* Violations</u>

In his final ground for review,[8] Olsen asserts the State violated <u>Brady</u>[9] by suppressing evidence. He first claims that the State suppressed Exhibits 19 and 22, which were both photographs. But the record reflects that both photographs were part of the discovery produced by the State before trial. Olsen also argues the State should have further searched a bag in the car for exculpatory evidence, but "the State has no duty to search for exculpatory evidence." <u>In re Pers. Restraint of Gentry</u>, 137 Wn.2d 378, 399, 972 P.2d 1250 (1999).

Next, Olsen asserts that a "Flaherty Report Feb 26 2022" indicated documents belonging to Tibbetts were in the car, and that these documents, which had exculpatory value as "other suspect evidence," were improperly destroyed. But for reasons already discussed, Olsen's "other suspect" theory was not viable even if there was evidence that Tibbetts also had access to the car. Olsen also refers to an iPhone that was "confirmed on record to exist" in an April 12, 2022 email from the prosecutor to defense counsel. But nothing in the referenced email or Olsen's SAGR shows that the phone—which the email indicates defense counsel was aware of—was improperly suppressed by the State. Olsen refers to another phone that he says was also referenced on the record, but the cited portion of the record does not contain any reference to a phone, much less show that any such phone was under the State's control or

---

[8] On page 36 of his SAGR, Olsen provides a list of "additional unfair issues." This list of conclusory allegations does not provide a basis for appellate review under RAP 10.10(c).

[9] <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

improperly suppressed.

Finally, Olsen again refers to Fox's report that was inconsistent with Flaherty's testimony. But as Olsen himself acknowledges, the decision not to admit Fox's written report was made by the court. The State did not suppress the report, and thus, its suppression is not a basis for a <u>Brady</u> claim.

### III.    CONCLUSION

We affirm.

Díaz, J.

WE CONCUR:

Smith, C.J.                          Dwyer, J.