IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 34708-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| VINCENTE GUIZAR FIGUEROA, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — A jury found Vincente Guizar Figueroa guilty of several felonies arising from kidnapping a family in Kennewick, Washington, and robbing the family's jewelry store. Vincente[1] committed these crimes when he was 15 years old.

On appeal, he contends (1) the trial court erred in admitting ER 404(b) evidence of another crime he committed in Bakersfield, California, (2) the trial court erred when it denied him his right to present other suspect evidence, (3) the State presented insufficient evidence to sustain his convictions, (4) the sentencing court violated his rights under the

_____

[1] We use defendant's first name to distinguish him from his older brother, Umberto.

Eighth Amendment to the United States Constitution when it imposed mandatory

consecutive sentences and firearm enhancements without exercising its discretion as

required by *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), (5) the

judgment and sentence should reflect that his sentence is to run concurrently with his

Bakersfield sentence, and (6) the sentencing court erred when it imposed discretionary

legal financial obligations (LFOs) without conducting an adequate inquiry into his ability

to pay.

We affirm Vincente's convictions. But because the record does not sufficiently

show that the trial court understood its full discretion to sentence Vincente without regard

to mandatory minimums and mandatory enhancements, we reverse Vincente's sentence

and remand for resentencing.

FACTS

*Kennewick, Washington*

On February 9, 2011, Hayley Welsh was with her young son T.W. at the family

home when she heard a knock on the door. Peering through a window, she saw two

Hispanic men in orange construction vests with hard hats, one of whom was carrying a

clipboard. She opened the door. One of the men told her they were from the energy

company and needed to come inside. As she was telling them to come back later, the men

2

pulled out guns and pushed their way inside the home. Once inside, the men put on

gloves and ski masks and took Hayley's cell phone.

One man, suspect 1, spoke English and Spanish. The other man, suspect 2, spoke

only Spanish. The men used zip ties to tie Hayley's and T.W.'s hands and feet. Suspect 1

warned Hayley not to look at them. Two additional members of the Welsh family,

Mackenzie and Jeanne, came home later. The men, still armed, tied their hands and feet

with zip ties. Suspect 1 warned the women not to look at them.

Mark Welsh, the owner of Touchstone Jewelers and the target of the crime, was

the last to arrive home. As he entered, one of the suspects ambushed him and held a gun

to his head. Suspect 1 told Mark that the three of them would go to Touchstone Jewelers

while another man would come and hold the family hostage. Once the third man arrived,

Mark drove the two men to the jewelry store in his truck.

Suspect 1 ordered Mark to disarm the security, open the safe, and remove the

jewelry. Mark complied. The stolen jewelry was valued at over $370,000. Mark drove

himself and the two others back to his home.

One of the suspects told the family they had additional people watching the house

and not to call police for 30 minutes. The men used T.W.'s black and blue backpack to

3

carry the stolen jewelry. They then took Mark's truck and escaped. Law enforcement later found Mark's truck in a nearby housing development.

*Descriptions of the suspects and additional evidence*

Hayley described suspect 1 as a "smooth talker" who knew how to talk to people and said he appeared to be in charge. 1 Report of Proceedings (RP) (July 19-21, 2016) at 55. Mark described suspect 1 as very composed and calm.

Members of the Welsh family had slightly different descriptions of suspects 1 and 2. Hayley thought suspect 1 was younger than suspect 2, possibly in his 20s, thin, and possibly with freckles. She thought he might be 5'8" tall. Hayley thought suspect 2 was older, taller, and heavier. Despite seeing the men before they wore masks, Hayley could not identify Vincente in a later photomontage.

Mackenzie could not estimate age or height for either man. Jeanne thought suspect 1 was young, but could not estimate how young. Mark thought suspects 1 and 2 were about the same age, in their 20s, but that suspect 1 was 5'8" to 5'10", and suspect 2 was heavier.

When law enforcement searched Mark's abandoned truck, they found a clipboard with handwritten notes on the top page. The notes included a checklist of items, the

4

initials PGNE[2] in large handwriting, and the Welsh's address. An expert witness called by the State later testified that he analyzed the pages attached to the clipboard, that he found several finger and thumb prints on three of the pages, and that they all matched Vincente's prints. He also testified that he found no other prints on any of the pages.

*Bakersfield, California*

On June 6, 2011, two armed Hispanic intruders entered the home of Donald Younger, owner of Bakersfield Best Pawn, in Bakersfield, California. Donald, his wife, and their daughter were home at the time. The intruders were Vincente and his older brother Umberto.

The family's dogs barked incessantly at the Figueroa brothers, and Vincente instructed the family to quiet the dogs or else he would shoot them. Vincente demanded that Donald drive the three of them to the pawn shop so they could obtain guns and money. Vincente told Donald that another man would arrive to watch the family while they were gone. Neither Vincente nor Umberto wore a ski mask nor used zip ties to tie up the family.

Unbeknownst to Vincente and Umberto, Donald's parents-in-law were visiting. They snuck out a back door and used a neighbor's phone to call law enforcement. Police

---

[2] Perhaps shorthand for "Pacific Gas and Electric."

arrived and arrested the Figueroa brothers. At the time of the Kennewick and Bakersfield crimes, Vincente was 15 years old, 5'7" tall and weighed approximately 165 pounds. Umberto was the same height, but older and much heavier.

Vincente told Bakersfield police that he, Umberto, and a third man named Alex had been watching Mr. Younger and the pawn shop for about six days. He said he had even gone into the pawnshop to purchase earrings to do reconnaissance. He explained he did all of the talking to the family because his older brother speaks only Spanish.

Vincente also told police that his mother lives in Grandview, Washington, and that he had based the Bakersfield crime on an earlier Washington crime. Although Vincente lived in Modesto, California, he also spent time at his mother's home. Bakersfield law enforcement performed an Internet search and found similar crimes in the Washington area. They then called Washington law enforcement.

Eventually, Vincente and his brother pleaded guilty to the felonies associated with the Bakersfield crime and received sentences in excess of 29 years.

*Search of Ms. Figueroa's home*

Based on the Bakersfield crime and Vincente's statements, Washington law enforcement obtained a search warrant for Ms. Figueroa's home in Grandview. In her garage, they found two ski masks and two orange vests or jackets similar to the ones used

6

in the Kennewick crime. They also found a handwritten conversion list from karats to percentage of gold, and a blue and black backpack that matched T.W.'s backpack.[3]

*Procedural history*

The State charged Vincente by amended information with two counts of first degree burglary, five counts of first degree kidnapping, one count of first degree robbery, and one count of theft of a motor vehicle. The charges included four firearm enhancements and also a major economic offense aggravator, reflecting the significant value of the stolen jewelry.

      1.      *ER 404(b) identity evidence*

Prior to trial, the State sought to admit evidence of the Bakersfield crime to establish identity. Specifically, the State sought to elicit testimony from Mr. Younger and a Bakersfield detective about the Bakersfield crime and Vincente's admissions. The State argued that the two crimes were highly similar but unique from other crimes so that proof that Vincente committed the Bakersfield crime created a high probability that he also committed the Kennewick crime. Vincente objected and argued that the two crimes were not sufficiently unique from other crimes so as to be signature crimes. Vincente noted that there were three or four similar crimes that occurred in Washington and Oregon

---

[3] Hayley Welsh testified that the backpack looked like her son's. The backpack

7

between 2009 and 2011. The court heard argument. Because it had not yet reviewed

Vincente's brief, it took the motion under advisement.

One week later, the court issued a letter to the parties stating, "Assuming that the

four requirements for admission of other bad acts are appropriately addressed on the

record, the Court will grant the State's motion to admit the proposed ER 404(b) evidence

along with the appropriate limiting instruction." Clerk's Papers (CP) at 30. The State

thereafter presented proposed detailed findings of fact and conclusions of law consistent

with its briefing, which the court had considered. The court signed the State's proposed

findings and conclusions.

### 2. *Other suspect evidence*

On the morning of trial, the State asked the trial court to prevent Vincente from

arguing or suggesting in cross-examination of its witnesses that Umberto was involved in

the Kennewick crime. Vincente objected and argued that such a limitation would

interfere with his right to present a defense. The trial court granted the State's motion.

---

however was missing a small pin, an award T.W. had received from kindergarten.

The State called several witnesses. At the close of the State's case-in-chief, the State "withdrew"[4] its objection. The State told the trial court, if Vincente established he had direct knowledge that Umberto committed the Kennewick crimes, he could testify to that.

Vincente called only one witness—himself. He did not testify that his brother committed the Kennewick crime. Instead, he testified that he was living in California in February 2011, that he had not seen his mother until May 2011, and that the blue and black backpack was his. He also testified that he and his brother had given "Alex" a ride to Bakersfield and how it was his brother's and Alex's idea to commit the Bakersfield crime.

During its closing argument, the State argued that the Bakersfield and Kennewick crimes were so similar to each other, but unique from other crimes, that Vincente's admitted commission of the first showed he committed the second. The State also argued that T.W.'s backpack and Vincente's fingerprints on the paper attached to the clipboard further linked Vincente to the Kennewick crime.

---

[4] The trial court's ruling prevented Vincente from suggesting through *the State's witnesses* that Umberto was involved in the Kennewick crime. For this reason, the State's suggestion that it "withdrew" its objection after its witnesses testified is inaccurate and probably also disingenuous. More accurately, the objection and the trial court's order simply did not apply beyond the State's witnesses.

During his closing, Vincente argued that his brother, Alex, and an older person who spoke English and Spanish committed the Kennewick crime. He emphasized that Welsh family members had described suspect 1 as mature, intelligent, and in control, and how their physical descriptions of suspect 1 did not match him. Vincente argued that the Kennewick crime was professional and well-planned. He contrasted that crime with the Bakersfield crime, which was chaotic and not well-planned. Vincente emphasized that he and his brother did not use masks or zip ties. Vincente had testified that the blue and black backpack was his and argued in closing that it was a very common backpack and lacked T.W.'s pin. Vincente explained his prints on the papers by suggesting that his brother took the papers out of his backpack prior to the Kennewick crime.

### 3. Verdict and sentence

The jury returned a guilty verdict on each count and affirmative responses to the four firearm enhancements and the major economic offense special verdict forms.

The State submitted a sentencing brief that asked for a sentence within the standard range, despite the jury's finding of a major economic offense. Citing *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), the brief discussed the trial court's discretion to impose an exceptional downward sentence based on mitigating factors

associated with Vincente's youth. The State argued, however, that the mitigating factors did not fit the facts of the case.

At the sentencing hearing, Vincente cited *O'Dell* and argued that the mitigating factors applied to the facts of the case.

The sentencing court did not address, analyze, or acknowledge Vincente's request for an exceptional sentence downward. Nor did the sentencing court ask Vincente about his current assets and debts or about his likely future ability to pay costs.

Because of mandatory consecutive sentences and enhancements, the standard sentencing range was 593 to 710 months. The sentencing court imposed a sentence of 600 months. The sentence is calculated as follows: (1) 156 months on the first degree burglary conviction, which subsumed concurrent sentences for (a) the other first degree burglary conviction, (b) a robbery in the first degree conviction, and (c) a theft of a motor vehicle conviction, plus (2) 240 months for four mandatory, consecutive 60-month firearm enhancements, plus (3) 204 months for four 51-month mandatory, consecutive first degree kidnapping convictions. The judgment and sentence indicated that the Kennewick sentence was to run concurrently with the Bakersfield crime. The court also imposed $1,267.12 in discretionary LFOs.

Vincente appealed.

11

ANALYSIS

A.     ER 404(b) EVIDENCE OF OTHER CRIMES TO PROVE IDENTITY

Vincente argues that the trial court erred by admitting ER 404(b) evidence of the Bakersfield crime to prove his identity. He first argues the trial court erred by not performing an ER 404(b) analysis on the record. He then argues the court abused its discretion by concluding the Bakersfield crime and the Kennewick crime were highly similar so as to create a signature and erroneously concluded that the probative value of the evidence outweighed any unfair prejudice. We disagree with both arguments.

This court reviews the admission of evidence under ER 404(b) for an abuse of discretion. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). The trial court abuses its discretion when its decision is manifestly unreasonable or rests on untenable grounds or reasons. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as . . . identity."

        1.     *ER 404(b) analysis on the record*

"Before admitting ER 404(b) evidence, a trial court 'must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for

12

which the evidence is to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *Foxhoven*, 161 Wn.2d at 175 (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). The trial court must conduct the ER 404(b) analysis on the record. *Foxhoven*, 161 Wn.2d at 175 (citing *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986) (citing *State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984))).

The *Jackson* court explained the two primary reasons for requiring an on-the-record analysis of the ER 404(b) factors:

> We cannot overemphasize the importance of making such a record. Here, as in cases arising under ER 609, the absence of a record precludes effective appellate review. *See State v. Jones*, 101 Wn.2d 113, 677 P.2d 131 (1984). Moreover, a judge who carefully records his reasons for admitting evidence of prior crimes is less likely to err, because the process of weighing the evidence and stating specific reasons for a decision insures a thoughtful consideration of the issue.

*Jackson*, 102 Wn.2d at 694.

Here, the trial court heard argument on the State's ER 404(b) motion and took the motion under advisement so it could review and consider Vincente's brief. Next, it issued a letter to the parties saying it would grant the State's motion. The State then prepared extensive findings of fact and conclusions of law consistent with its briefing. The trial court then signed the prepared pleading.

13

The procedure followed here more than adequately addresses the two primary

concerns expressed in *Jackson*. First, the detail contained in the extensive written

findings and conclusions permits more effective appellate review than even the best oral

findings. Second, taking the time to review and consider the briefing, as was done by the

trial court here, ensures a more thoughtful process than an oral monologue, typically

spanning less than one minute. For these reasons, we conclude that the process followed

here more than satisfies the requirement that the trial court analyze the ER 404(b) factors

on the record.

### 2. *Application of ER 404(b) factors*

Vincente does not challenge the first two ER 404(b) factors—(1) he committed the

Bakersfield crime, and (2) the purpose for admitting evidence of that crime was to

establish identity, i.e., that he also committed the Kennewick crime. Instead, he argues

that evidence of the Bakersfield crime was not relevant, and the prejudicial effect of the

evidence outweighed the probative value.

### a. *The Bakersfield crime was relevant*

In *Thang*, our high court held:

> When evidence of other bad acts is introduced to show identity by
> establishing a unique modus operandi, the evidence is relevant to the
> current charge "only if the method employed in the commission of both
> crimes is 'so unique' that proof that an accused committed one of the

14

>crimes creates a high probability that he also committed the other crimes with which he is charged."

Thang, 145 Wn.2d at 643 (quoting *State v. Russell*, 125 Wn.2d 24, 66-67, 882 P.2d 747 (1994)). The prior crime "'must be so unusual and distinctive as to be like a signature.'" *Foxhoven*, 161 Wn.2d at 176 (internal quotation marks omitted) (quoting *State v. Coe*, 101 Wn.2d 772, 777, 684 P.2d 668 (1984)). Whether the prior crime is similar enough to the charged crime to warrant admission is left to the discretion of the trial court. *Id.* at 177 (quoting *State v. Jenkins*, 53 Wn. App. 228, 236, 766 P.2d 499 (1989)).

Here, the Bakersfield and Kennewick crimes were highly similar. Both involved (1) two young Hispanic men (2) using guns to (3) intrude into the home of a (4) business owner, (5) using (or planning to use) a third person, yet to arrive, to watch family members at the home, and (6) having (or planning to have) the business owner drive the two intruders to the business to commit the robbery. Even more telling, both involved a younger robber who was bilingual English/Spanish, and an older, heavier robber who was monolingual Spanish.

We recognize that the two crimes also had dissimilarities. For instance, one crime involved a ruse to gain entry, ski masks, and zip ties, whereas the other did not.

15

Vincente argues that the two crimes were not sufficiently unique because there were four other similar crimes committed in the Northwestern United States from 2009 through 2011.  Two of these "similar crimes" occurred in Oregon. Neither of those two crimes involved Hispanic men nor did any of the participants speak Spanish.  A third crime occurred in Yakima, and a fourth crime occurred in Wapato, just south of Yakima.  The record suggests that those latter crimes and the Bakersfield and Kennewick crimes do have significant similarities.

But even if the Yakima and Wapato crimes had significant similarities to the Bakersfield and Kennewick crimes, this would not require us to reverse the trial court.  This is because the Bakersfield and Kennewick crimes are nevertheless highly unique.  Because they are highly unique, the trial court did not abuse its discretion when it determined that proof that Vincente committed the Bakersfield crime made it highly probable that he also committed the Kennewick crime.

Moreover, substantial physical evidence corroborated Vincente's participation in the Kennewick crime.  Specifically, the pages attached to the clipboard used during the Kennewick crime bore Vincente's prints and did not contain anyone else's prints.  This fact contradicts Vincente's closing argument

16

that he had no involvement in the Kennewick crime and that his brother likely took his papers from his backpack.

We conclude the trial court did not abuse its discretion when it determined that evidence of the Bakersfield crime was relevant to the Kennewick crime.

> b.        *The probative value outweighs the unfair prejudice*

Vincente argues that evidence of the Bakersfield crime was unduly prejudicial because without it, the State's evidence was very weak, consisting only of his prints on papers found in Mark Welsh's truck and a backpack similar to T.W.'s found in Vincente's mother's home.

"'[U]nfair prejudice' is that which is more likely to arouse an emotional response than a rational decision by the jury," not simply evidence adverse to the opposing party. *State v. Gould*, 58 Wn. App. 175, 183, 791 P.2d 569 (1990).

Here, the trial court gave the jury a limiting instruction that specified how the jury was to consider the evidence of the Bakersfield crime. The instruction told the jury that it could consider evidence of the Bakersfield crime only for the purpose of identity and not for any other purpose. We presume that the jury followed the trial court's limiting instruction. *State v. Stein*, 144 Wn.2d 236, 247, 27 P.3d 184 (2001). During closing, the State properly limited its discussion of the Bakersfield crime to the issue of identity.

17

We conclude the trial court did not err by determining that the probative value of the Bakersfield crime was greater than the undue prejudice caused by its admission.

B.    OTHER SUSPECT EVIDENCE

Vincente contends the trial court violated his Sixth Amendment to the United States Constitution right to present a defense when it limited his cross-examination of the State's witnesses. He relies on *State v. Jones*, 168 Wn.2d 713, 230 P.3d 576 (2010) and *State v. Starbuck*, 189 Wn. App. 740, 355 P.3d 1167 (2015) for the proposition that a trial court's order limiting cross-examinations of witnesses can violate a defendant's constitutional right to present a defense. But Vincente fails to explain what evidence the trial court's ruling precluded him from eliciting and how that impaired his defense.

The trial court's ruling prevented Vincente from suggesting or arguing through the State's witnesses that Umberto had committed the Kennewick crime. Vincente's defense was not that his brother committed the Kennewick crime. The State never contested that. Vincente's defense was that he was not suspect 1; instead, suspect 1 was an older, bilingual Hispanic man.

The trial court's ruling did not prevent Vincente from cross-examining the State's witnesses to establish that suspect 1 was an older, bilingual Hispanic man. First, the Welsh family members generally described suspect 1 as mature and in control, and in his

18

20s or 30s. Second, they described suspect 1's physical appearance slightly dissimilar to Vincente. Most importantly, Vincente argued extensively in closing that he was not suspect 1. His argument was based on evidence obtained from the State's witnesses that suspect 1 was an older, articulate, bilingual Hispanic man.

The trial court's ruling did not diminish Vincente's ability to cross-examine the State's witnesses with regard to suspect 1. We conclude that the trial court's ruling did not impair Vincente's ability to present his defense, i.e., that he was not suspect 1.

C.      SUFFICIENCY OF THE EVIDENCE

Vincente next challenges the sufficiency of the evidence, claiming the State did not present sufficient evidence that he was the person who committed the Kennewick crime. We disagree.

In a criminal case, the State must provide sufficient evidence to prove each element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In evaluating the sufficiency of the evidence, the court must determine whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Pirtle*, 127 Wn.2d 628, 643, 904 P.2d 245 (1995). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences from

that evidence. *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). Reviewing courts also must defer to the trier of fact "on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). This court does not reweigh the evidence and substitute its judgment for that of the jury. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion). For sufficiency of evidence claims, circumstantial and direct evidence carry equal weight. *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004).

Vincente cites *State v. Thomson*, 70 Wn. App. 200, 211, 852 P.2d 1104 (1993), *aff'd*, 123 Wn.2d 877, 872 P.2d 1097 (1994), for the principle that the identity of the criminal defendant and his presence at the scene of the crimes charged must be proved beyond a reasonable doubt. He raises four specific arguments in his sufficiency challenge. We address each separately.

1.      *Whether Vincente was in Washington on February 9, 2011*

Vincente cites his own testimony that he did not come to Washington until May 2011. Nevertheless, he testified that his mother lived in Grandview and that he sometimes visited her. Moreover, the papers found in Mark Welsh's truck had Vincente's prints and only his prints. A jury could reasonably discount Vincente's own

self-serving testimony and put weight on the uncontroverted fact that only Vincente's prints were on the papers found in Mark Welsh's truck.

2.     *Whether the Welsh family members sufficiently identified Vincente*

Hayley Welsh was the only person who briefly saw suspect 1 without a ski mask. She described suspect 1 as possibly having freckles. Vincente does not have freckles. In a photomontage, she could not identify Vincente as suspect 1.

In addition, family members variously described suspect 1 as in his 20s to 30s, short, between 5'8" and 5'10," and conflictingly chubby or skinny. All identified suspect 1 as speaking English and Spanish. Vincente was 15 in early 2011, 5'7" tall, and spoke English and Spanish. But a jury could reasonably discount these various descriptions, given that suspect 1 was wearing a ski mask and told the Welsh family members not to look at him.

Hayley Welsh and Mark Welsh described suspect 1 as a smooth talker, in charge, and very composed and calm. Although this description of suspect 1 would not match most descriptions of a 15 year old, the record contains no evidence about Vincente's intelligence, maturity, and verbal ability. We note that the jury heard Vincente testify and could reach its own conclusion on this issue.

3.     *No evidence that Vincente touched certain items in his mother's home*

21

Vincente argues that the State presented no evidence that he touched the ski masks or the orange vests or jackets found in his mother's garage. Although true, this does not preclude the jury from reasonably finding that other evidence, such as the three papers found in Mark Welsh's truck, linked Vincente to the Kennewick crime.

### 4.     *Fingerprints alone cannot sustain a conviction*

Vincente relies on *State v. Bridge*, 91 Wn. App. 98, 955 P.2d 418 (1998) for the proposition that fingerprints alone cannot sustain a conviction. In *Bridge*, an unidentified person broke into the victim's barn by destroying the door and moving various items around. *Id*. at 99. The perpetrator moved a newly purchased tool to the point of entry, and law enforcement found Mr. Bridge's fingerprint on the price tag. *Id*. The victim did not know or recognize Mr. Bridge and law enforcement arrested him. *Id*. He was convicted of second degree burglary. *Id*. On appeal, this court reversed and dismissed the charges, reasoning that the only evidence was the single fingerprint, and it was located on a movable, recently purchased object that had been accessible to anyone while in the stream of commerce. *Id*. at 101. In those circumstances, that sole fingerprint was insufficient evidence.

The facts of this case are distinguishable. The State presented (1) ER 404(b) evidence to show identity between the Bakersfield and Kennewick crimes, (2) items

22

recovered from Vincente's mother's home that connected a family member with the Kennewick crime, and (3) Vincente's prints, and only his prints, on three papers found in Mark Welsh's truck. The quantity of evidence tying Vincente to the Kennewick crime is substantially greater than the paucity of evidence presented in *Bridge*. In addition, the presence of Mr. Bridge's fingerprint on a price tag attached to a recently purchased item could have an innocent explanation. Here, Vincente never provided an innocent explanation why his prints, and his prints only, were on three papers found in Mark Welsh's truck.

In conclusion, the State presented sufficient evidence for a jury to find beyond a reasonable doubt that Vincente was suspect 1.

D.    SENTENCING UNDER *HOUSTON-SCONIERS*

Vincente claims the sentencing court violated his protections under the Eight Amendment when it did not consider the hallmark features of his youth and related mitigating considerations. The State responds that the mitigating considerations do not apply because the Kennewick crime was well-planned and was not an impetuous act of a youth. Alternatively, and somewhat contradictorily, the State argues that the sentencing court exercised its discretion and mitigated Vincente's sentence when it imposed a

23

sentence on the low end of the standard range and when it declined to impose the major economic crime aggravator.

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, provides that a standard range sentence "shall not be appealed." RCW 9.94A.585(1); *see also* former RCW 9.94A.210(1) (1989). "'However, this prohibition does not bar a party's right to challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision.'" *State v. Ramos*, 187 Wn.2d 420, 433, 387 P.3d 650, *cert. denied*, 138 S. Ct. 467, 199 L. Ed 2d 355 (2017) (quoting *State v. Williams*, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003)).

In *O'Dell,* the defendant had just turned 18 when he had sex with a 12-year-old girl. 183 Wn.2d at 683. *O'Dell* noted that youth may relate to a defendant's crime, and therefore "youth can . . . amount to a substantial and compelling factor, in particular cases, justifying a sentence below the standard range." *Id*. at 696. *O'Dell* held that trial courts "must be allowed to consider youth as a mitigating factor when imposing a sentence" on a youthful offender. *Id*.

In *Houston-Sconiers*, the defendants were 16 and 17 at the time they used a gun to rob mostly Halloween candy from children. *Houston-Sconiers*, 188 Wn.2d at 9-11. The juveniles were convicted in adult court of multiple crimes, including several counts of

robbery, together with several mandatory firearm enhancements. *Id*. at 12. The trial

judge commented during sentencing that he wished he had discretion to impose a lesser

sentence but could not because he had taken an oath to follow the law. *Id.* at 13.

*Houston-Sconiers* affirmed the convictions but remanded for resentencing. *Id*. at 34.

*Houston-Sconiers* notes that children are not adults, and that the Eight Amendment

to the United States Constitution requires sentencing courts to consider the offender's

youthfulness at the time the offense was committed when imposing the sentence.

*Houston-Sconiers* holds:

> [S]entencing courts must have complete discretion to consider mitigating
> circumstances associated with the youth of any juvenile defendant, even in
> the adult criminal justice system, regardless of whether the juvenile is there
> following a decline hearing or not. To the extent our state statutes have
> been interpreted to bar such discretion with regard to juveniles, they are
> overruled. Trial courts must consider mitigating qualities of youth at
> sentencing and must have discretion to impose any sentence below the
> otherwise applicable SRA range and/or sentence enhancements.

*Id.* at 21 (footnote omitted). *Houston-Sconiers* explains:

> [I]n exercising full discretion in juvenile sentencing, the court must
> consider mitigating circumstances related to the defendant's youth—
> including age and its "hallmark features," such as the juvenile's
> "immaturity, impetuosity, and failure to appreciate risks and
> consequences." [*Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 2468,
> 183 L. Ed. 2d 407 (2012)]. It must also consider factors like the nature of
> the juvenile's surrounding environment and family circumstances, the
> extent of the juvenile's participation in the crime, and "the way familial and
> peer pressures may have affected him [or her]." *Id.* And it must consider

25

> how youth impacted any legal defense, along with any factors suggesting
> that the child might be successfully rehabilitated. *Id.*

*Id*. at 23 (second alteration in original).

Arguably, the record shows that the sentencing court believed a mitigated sentence was appropriate. Here, the sentencing court did not impose the major economic crime aggravator and sentenced Vincente at the very low end of the standard range.

But the record is insufficient to show whether the trial court understood it could impose a mitigated sentence without regard to mandatory minimums and mandatory consecutive sentences. This is not surprising. The trial court sentenced Vincente before *Houston-Sconiers* and no Washington court had yet explicitly held that a trial court had authority to disregard mandatory minimums and mandatory consecutive sentences when sentencing a defendant who was a minor at the time the crime was committed. The dissent is mistaken when it claims the trial court understood its authority to do so. The State's sentencing brief did not concede that point nor did the State concede this point during argument at sentencing. A trial court is not required to explicitly explain its sentence on the record. However, had the trial court stated on the record that it knew it had authority to sentence Vincente without regard to mandatory minimums and mandatory consecutive sentences, but was electing not to exercise such authority, we

26

would not be required to remand this matter for resentencing.[5]

On remand, the trial court should explain whether and to what extent the mitigating circumstances of Vincente's youth apply to the Kennewick crime. If the trial court finds that mitigating circumstances do apply, it should also explain its understanding of its full discretion to sentence Vincente without regard to mandatory minimums and mandatory consecutive sentences.

Because resentencing is required, we do not address Vincente's arguments about whether his sentence should be corrected to reflect that it is concurrent with the Bakersfield sentence and whether the sentencing court erred in not conducting an adequate inquiry into his ability to pay.

Finally, Vincente asks that we exercise our discretion and not award appellate costs to the State in the event it substantially prevails. We conclude there is no substantially prevailing party and deny the State an award of appellate costs.

---

[5] The dissent pens compelling arguments for the State to make on remand. We are confident that Vincente can make his own compelling arguments and so refrain from making those arguments for him.

In addition, the dissent seemingly invites the sentencing court to impose a greater sentence on remand than imposed by the original judge who is now retired. We express no opinion whether the sentencing court on remand should impose a lesser, greater, or equal sentence. Nor do we agree with the dissent that a greater sentence by a different judge may not be deemed vindictive.

No. 34708-7-III
*State v. Figueroa*

We affirm Vincente's convictions, but we reverse his sentence and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

I CONCUR:

Pennell, J.

28

No. 34708-7-III

KORSMO, J. (dissenting) — The trial court already did everything that it was required to do and apparently concluded that this crime did not exhibit the impulsiveness of youth that is the constitutional basis for treating leniently some minors who commit major crimes. Since the trial court considered the argument already, there is no reason to send this back for another review. I also part company with the majority's needless and erroneous criticism of the prosecutor withdrawing his motion in limine after the State's evidence had been presented. Far from being critical, we should be commending this approach to all trial judges who face efforts from a party attempting to enter evidence without sufficient foundation. For both reasons, I respectfully dissent from those two portions of the majority opinion.

As to the sentencing issue, the record of this case is clear that the trial judge and the parties knew that Vincente Figueroa's youth at the time of the offense was a basis for granting an exceptional sentence under *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015). It was briefed by the parties and, indeed, the very first words out of defense counsel's mouth at sentencing expressly addressed the topic:

> MS. HARKINS: Your Honor, just a couple things. I know you read the state's sentencing memo, and I'm obviously just going to be addressing the portion that talks about going below the 593 months and doing an

exceptional sentence downward, and that's based on State vs O'Dell. And the state did lay out three reasons that you can do that: Impulsivity, poor judgment, susceptibility to outside influences, and I'm sure that you're familiar with that case. And in that case we're talking about an 18-year-old, who actually it's ten days past his 18th birthday, and in that case the Court of Appeals sent the case back for the Court to consider his youth and because they've now learned that youth does make a difference. In fact, the brain isn't even developed as it is in people who are in their later 20s.

I think that's relevant, because here we're not talking about somebody who just turned 18. At the time of this crime, it was six years ago, and he was 15 years old. If in any case youth is taken into consideration, I think that it needs to be taken into consideration in this case.

Report of Proceedings (RP) (Aug. 25, 2016) at 5-6.

Defense counsel continued in this vein and argued that it made no sense to impose more time than the 29 years defendant already was serving on the California convictions. RP at 8-10. The court also heard two victim impact statements and heard the defendant deny involvement in the offense. RP at 11. The trial court also knew that the jury had found the presence of an aggravating factor—this crime involved a major economic offense. Clerk's Papers (CP) at 139. The prosecutor's trial memorandum noted the aggravating factor and indicated it would not seek an exceptional sentence, but would seek a standard range sentence of 600 months. CP at 145. The trial court concluded sentencing by choosing low or midrange sentences for each offense and running consecutively those offenses and enhancements that normally are "required" to be run consecutively and running concurrently those offenses that needed to be run concurrently.

2

The 600 month total sentence was a mere seven months above the bottom end of the sentencing range.

Mr. Figueroa received a standard range sentence. By statute, affirmed by our case law, Mr. Figueroa cannot challenge that sentence. RCW 9.94A.585(1); *State v. Grayson*, 154 Wn.2d 333, 338, 111 P.3d 1183 (2005). Instead, all he can challenge is the trial court's failure to follow a *mandatory* procedure at sentencing. *State v. Mail*, 121 Wn.2d 707, 712, 854 P.2d 1042 (1993). In the context of youthful offenders, the dictate of the constitution is that the trial court consider the offender's youth when imposing sentence and have the discretion to mitigate a sentence because of that factor. *State v. Scott*, No. 94020-7 slip op. at 8-11 (Wash. May 10, 2018) http://www.courts.wa.gov/opinions/pdf/940207.pdf.

Here, the trial court did what it was required to do—*consider* the defendant's request for an exceptional sentence that would have been similar in length to and concurrent with the California sentence. Thus, there is no basis for even hearing this challenge, let alone a reason for reversing the sentence. Nonetheless, apparently interpreting the word "consider" as meaning "articulate on the record," the majority faults the trial judge for not "considering" the exceptional sentence. There is no basis for this conclusion. In the nearly 34 years that Washington has acted under the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, there is no provision under that statute and no case law requiring a trial court to explain why it is refusing to impose an exceptional

3

sentence. It is not a mandatory procedure under the SRA. Mr. Figueroa has no basis for even bringing this challenge to his standard range sentences.

Of course, it also is plain why his pitch for an exceptional sentence was rejected. Not only did he pull off a successful robbery and commit 8 serious or serious violent offenses, the $372,000 worth of diamonds has gone unrecovered for more than 8 years. The jury understandably concluded this was a major economic offense, a decision that could justify the successor judge on remand[1] exceeding the 710 month top end of the standard range. The request also failed under the facts of this case. This was an exceptionally well-planned and well-executed crime. It did not bear any hallmarks of youthful impulsiveness. It also appeared to be part of a pattern of similar crimes and did not suggest immaturity. The defendant moved across state lines, worked with two adults, and had a major role in the operation. This was not a juvenile lark.

Moreover, the defense presented no evidence that even attempted to establish the youthful mitigation factor. There was no evaluation of the defendant nor any indication about his maturity level at the time of the crime. He did not claim to be acting under the direction of his big brother or some other adult. Of course, since he continues to deny

---

[1] With the retirement of the original trial judge and the passage of nearly a decade from the successful robbery with the diamonds remaining missing, a successor judge may view the facts of the case differently than the trial judge did; there would be no possibility of judicial vindictiveness in giving a greater sentence. *State v. Parmelee*, 121 Wn. App. 707, 708-709, 90 P.3d 1092 (2004) (no presumption of vindictiveness arises when different judge imposes more severe sentence).

4

committing the offense, it is highly unlikely on remand that there will be any evidence presented to justify an exceptional sentence below the standard range.

The trial court "considered" the exceptional sentence under the typical meaning of that term. There was no evidence to support a mitigated sentence. Given that the jury also found an aggravating factor present, there is no reason to order a resentencing in this case.

While the foregoing is a sufficient reason to dissent, the majority's inclusion of footnote 4 would have compelled me to dissent even if the sentencing argument had been rejected. Far from criticizing the prosecutor, we should be commending this tactic to all trial judges and trial attorneys.

The footnote errs in suggesting that there was anything untoward in maintaining a proper objection (supported by the trial court ruling) during the State's case since none of the State's witnesses could present any evidence in support of the defendant's purported theory that Mr. Figueroa's brother Umberto committed these offenses.[2] The trial court correctly excluded this evidence for lack of foundation. Moreover, the statement that the prosecutor "withdrew" his objection is factually accurate. It also was the proper thing to

---

[2] It also would have been stupid for the defense to make the argument that Umberto committed the Kennewick crimes since both brothers had been convicted of the California crimes. Tying his brother to the current offenses was further circumstantial evidence of Vincente's guilt in these crimes.

do once the defendant decided to testify. Prior to the defense presentation of its case, the

prosecutor addressed the court:

> Your Honor, just for the record, I think the defendant might be testifying, but we will actually withdraw our objection. If he wants to get on the witness stand and say that his brother was a perpetrator and he has some direct knowledge about that on our offense here in Kennewick. So he can say that if he has some direct knowledge that his brother's a perpetrator, we'll withdraw our objection and he can so testify.

2 RP (July 21, 2016) at 342.

Accordingly, I do not know how the majority can suggest either this statement, or

the correct citation to it in the briefing, is the least bit "disingenuous."[3]  The only possible

source for the majority's discomfort is that the prosecutor waited until the State's case

had concluded before withdrawing its objection.

That was perfectly proper and probably constitutionally compelled. Although the

defendant has the constitutional right to present a defense, that right does not include

evidence that is irrelevant or inadmissible. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d

576 (2010); *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983). With respect to

"other suspects evidence," Washington has very strict standards that are consistent with

those of the United States Supreme Court. *See State v. Franklin*, 180 Wn.2d 371, 378,

325 P.3d 159 (2014) (a trial court's exclusion of "other suspect evidence" is an

---

[3] The term means "lacking in candor" or "giving a false appearance of simple frankness." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 650 (1993).

application of the general evidentiary rule that excludes evidence if its probative value is outweighed by such factors as unfair prejudice, confusion of the issues, or potential to mislead the jury (citing *Holmes v. South Carolina*, 547 U.S. 319, 326-327, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

Washington permits a criminal defendant to present evidence that another person committed the crime when he can establish "a train of facts or circumstances as tend clearly to point out some one besides the prisoner as the guilty party."[4] *State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932); *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992), *cert. denied*, 508 U.S. 953 (1993). The United States Supreme Court has approved this standard for admitting "third party guilt" evidence. *Holmes*, 547 U.S. at 327. Moreover, this evidence will only be admitted if the defendant can present a combination of facts or circumstances that points to a nonspeculative link between the other suspect and the crime. *Franklin*, 180 Wn.2d at 381. The standard for the relevance of such evidence is whether it tends to connect someone other than the defendant with the charged crime. *Id.*

---

[4] In establishing a foundation for admission of "other suspect evidence," the defendant must show a clear nexus between the other person and the crime. *State v. Rafay*, 168 Wn. App. 734, 800, 285 P.3d 83 (2012), *review denied*, 176 Wn.2d 1023, *cert. denied*, 571 U.S. 867 (2013). The proposed evidence must also show that the third party took a step indicating an intention to act on the motive or opportunity. *Id.* Evidence of possible motive alone is insufficient to establish this nexus. *State v. Kwan*, 174 Wash. 528, 533, 25 P.2d 104 (1933); *State v. Condon*, 72 Wn. App. 638, 647, 865 P.2d 521 (1993).

7

Here, the defendant had no evidence that Umberto Figueroa committed these crimes to the exclusion of Vincente Figueroa. He can point to no evidence possessed by any of the State's witnesses that suggested Umberto's involvement in the crimes.[5] Accordingly, the trial court correctly granted the motion in limine to exclude questioning of the State's witnesses about the possible involvement of Umberto Figueroa.

That changed once the defendant was ready to take the stand. If he had personal knowledge that his brother was involved, prohibiting testimony about that topic might have violated Vincente Figueroa's right to present a defense. *Jones*, 168 Wn.2d at 720. It was prudent for the prosecutor to withdraw his objection in the (highly unlikely) event that Mr. Figueroa wanted to blame his brother for the Kennewick crimes.

Accordingly, there was nothing disingenuous about the prosecutor's actions. He convinced the trial judge to prohibit the improper questioning of witnesses who had no evidence to present on the topic. However, once the defendant decided to testify and was in a position to provide a proper foundation for other suspects evidence, the objection was withdrawn in order to facilitate the right to present a defense. The defense had no constitutional right to ask foundationless questions of witnesses who did not know about Umberto Figueroa's involvement in the Kennewick crimes.

---

[5] We may well speculate that Kennewick law enforcement suspected Umberto was involved due to his work with Vincente Figueroa in the California case and his presence in Kennewick at the time of these crimes, but there appears to be no hard evidence supporting that suspicion.

8

This was excellent practice and should be commended to all.  Since the majority

thinks otherwise, I also dissent on this point.

Korsmo, J.